Argued January 27, re-argued April 6, affirmed April 17, 1928.

# STATE EX REL. VAN WINKLE, ATTORNEY GENERAL, *v.* JOHN C. SIEGMUND, COUNTY JUDGE, ET AL.

(266 Pac. 1075.)

**Courts—State Court's Jurisdiction in Mandamus to Compel County Officers to Pay State Sum Due Under Federal Statute Held not Incompatible With Federal Courts' Jurisdiction (Act Cong. July 13, 1926 [44 Stat. 915]).**

1. Jurisdiction of state court in *mandamus* to compel county officers to pay state amount alleged to be due it under Act Cong. July 13, 1926 (44 Stat. 915), in lieu of state taxes on railroad grant lands revested in United States, is not incompatible with jurisdiction of federal courts; such claim being appropriate matter for adjudication of state courts.

**Mandamus—Mandamus Lies to Compel County Officers to Pay State Any Definite Sum in Their Possession Belonging to State.**

2. Writ of *mandamus* would lie to compel county officers to pay state any definite sum in their possession belonging to state.

**Action—Courts Should not Hesitate About Procedural Technicalities, When State Government and Its Legal Subdivisions are Concerned.**

3. Courts should not hesitate and quibble about technicalities in matter of procedure, when state government and its legal subdivisions are concerned.

**Taxation—State's Claim Against County for Amount Due in Lieu of State Taxes on Railroad Grant Lands Revested in United States must be Brought Within Federal Statute by Showing That Part of Sum Paid County Should be Paid to State so That Latter will Receive Same Amount as if Paid by Taxpayers (Act Cong. July 13, 1926, § 5 [44 Stat. 916]).**

4. State's claim in *mandamus* to compel county officers to pay state amount alleged to be due in lieu of state taxes on railroad grant lands revested in United States, must be brought within and governed by Act Cong. July 13, 1926, Section 5 (44 Stat. 916), by showing in writ that some part of sum paid county by United States under such act should be apportioned and paid to state so that latter will receive same amount as though money had been paid by taxpayers.

**Taxation—Statement in Writ of Mandamus to Compel County Officers to Pay State Amount Due in Lieu of State Taxes on Railroad Grant Lands Revested in United States, That Certain Amount Would have Been Levied as State Tax, Held not**

Equivalent to Required Statement That Such Amount Would have Been Apportioned or Paid to State so That It Would Receive Same Amount as if Paid by Taxpayers (Act Cong. July 13, 1926, § 5 [44 Stat. 916]).

5.    Statement in writ of *mandamus* to compel county officers to pay state amount alleged to be due under Act Cong. July 13, 1926, Section 5 (44 Stat. 916), in lieu of state taxes on railroad grant lands revested in United States, that certain amount would have been levied as state tax, *held* not equivalent to statement, required by such act, that such amount would have been prorated, apportioned, or paid to state so that it would receive same amount as though money were paid by taxpayers.

Taxation—State Lost No Taxes by Revestment of Railroad Grant Lands in United States and Hence Could not Allege That State Taxes Thereon Would have Been Apportioned or Paid to State, as Required to Sustain Its Claim Against County Therefor (Or. L., §§ 4184, 4214–4217; Acts Cong. July 25, 1866 [14 Stat. 239]; April 10, 1869 [16 Stat. 47]; May 4, 1870 [16 Stat. 94]; July 13, 1926, § 5 [44 Stat. 916]; Or. L., § 4339, as Amended by Laws 1925, p. 68, § 4).

6.    Presumption being that total state revenue, ascertained under Section 4214, Or. L., by state tax commission, created by Section 4184, was apportioned to counties in manner provided by Sections 4215, 4216, and paid to state by them, state lost nothing in taxes by revestment in United States of lands granted to railroad company under Acts Cong. July 25, 1866 (14 Stat. 239), April 10, 1869 (16 Stat. 47), and May 4, 1870 (16 Stat. 94), and hence cannot allege that amount which would have been levied as state tax thereon would have been apportioned or paid to state by county, so as to give it same amount as if money were paid by taxpayers, as required to sustain its claim against county therefor under Act Cong. July 13, 1926, Section 5 (44 Stat. 916), in view of Section 4217, Or. L., and Section 4339, as amended by Laws of 1925, page 68, Section 4, prohibiting deductions from apportionment or payment of any county.

Mandamus—To Warrant Peremptory Writ Compelling State Officers to Pay State Amount Due in Lieu of State Taxes on Railroad Grant Lands Revested in United States, Alternative Writ must Disclose Clear Duty to Pay Amount Provided (Act Cong. July 13, 1926, § 5 [44 Stat. 916]).

7.    To issue peremptory writ of *mandamus*, requiring county officers to pay state amount alleged to be due under Act Cong. July 13, 1926, Section 5 (44 Stat. 916), in lieu of state taxes on railroad grant lands revested in United States, alternative writ must disclose clear duty of defendants to pay amount therein provided.

Counties—County's Obligation to Contribute Portion of State Revenue is Statutory, and County Officer cannot Pay County Funds to State Official Unless Statute so Directs (Or. L., § 4339, as Amended by Laws 1925, p. 68, § 4).

8.    County's obligation to contribute its portion of state revenue exists only by virtue of statute, Section 4339, Or. L., as amended by

Laws of 1925, page 68, Section 4, and, to warrant or authorize county officer to pay county funds to state official or anyone else, the law must so require and direct.

**Mandamus—Allegation of Writ of Mandamus That County has Received from United States Sum Which Law Specifically Requires It to Pay State Held Mere Conclusion (Act Cong. July 13, 1926, § 5 [44 Stat. 916]).**

9. Allegation of writ of *mandamus* to compel county officers to pay state amount alleged to be due it under Act Cong. July 13, 1926, Section 5 (44 Stat. 916), in lieu of state taxes on railroad grant lands revested in United States, that county has received from United States and has in its possession stated sum, which it is specifically required and directed by law to pay to state, *held* mere conclusion, based on other allegations of writ, and insufficient to show legal duty to pay such sum or any part thereof.

**Taxation—There is No Apportionment by County to State of Taxes Assessed, Levied and Collected by County (Or. L., § 4339, as Amended by Laws 1925, p. 68, § 4).**

10. County's liability to pay its proportionate share of state revenue to state not being limited to payment of amount of tax money collected by county for state purposes, under Section 4339, Or. L., as amended by Laws of 1925, page 68, Section 4, there is no apportionment by county in favor of state of taxes assessed, levied and collected by county.

**Taxation—State Tax Rates Do not Affect State's Claim Against County for Amount Due in Lieu of State Taxes on Railroad Grant Lands Revested in United States (Or. L., § 4217, and § 4339, as Amended by Laws 1925, p. 68, § 4; Act Cong. July 13, 1926, § 5 [44 Stat. 916]).**

11. As no part of payment of ordinary tax delinquency would be apportioned to state by county, in view of Section 4217, Or. L., and Section 4339, as amended by Laws of 1925, page 68, Section 4, rates of state taxes for years following revestment of railroad grant lands in United States do not govern or affect amount of state tax payable by county, nor state's claim in *mandamus* to compel county officers to pay amount alleged to be due state under Act Cong. July 13, 1926, Section 5 (44 Stat. 916), in lieu of such taxes.

**Taxation—"Taxes" Levied by Subdivisions of County are Apportioned Only as Collected by County, While State Tax is Preferred Claim Payable Whether Collected or not (Or. L., §§ 4217, 4310, 4311, 4314, and § 4339, as Amended by Laws, 1925, p. 68, § 4).**

12. Taxes levied by school districts and other civil subdivisions of county under Section 4310, Or. L., and collected with county taxes and paid over to such subdivisions by county treasurer under Sections 4311, 4314, are essentially "taxes," available, prorated and apportioned only as collected, whereas "state tax," required to be paid by county without deductions from first moneys collected, under Section 4217 and Section 4339, as amended by Laws of 1925,

page 68, Section 4, is a preferred claim and debt, to be paid whether collected or not.

**Taxation—None of Funds Paid County by United States in Lieu of Taxes on Railroad Grant Lands Revested in Government is Due State (Act Cong. July 13, 1926, § 5 [44 Stat. 916]; Or. L., § 4314).**

13.   Under Act Cong. July 13, 1926, Section 5 (44 Stat. 916), requiring that funds paid to county by United States under such act in lieu of taxes on railroad grant lands revested in United States be prorated and apportioned to county, school districts and other subdivisions of county, as required by state law, no part thereof is due state, in view of Section 4314, Or. L.; "state, county, port districts," etc., as used in such act, being words of general definition, embracing all possible beneficiaries of funds and restricted by last clause of Section 5, so that state, county and each civil subdivision will receive same amount as though money had been paid by taxpayer for each year.

**Statutes—Court may Consider Condition Prevailing When Law Being Construed was Enacted.**

14.   It is the province of the court to take into consideration the condition prevailing at the time when a law being construed was enacted.

**Statutes—Words of Statute are Understood in Sense Best Harmonizing With Subject and Lawmakers' Object and Intent.**

15.   Words of statute are to be understood in the sense in which they best harmonize with the subject of the enactment and the object and intent of the lawmakers.

**Statutes—Statute must be Construed According to Legislative Intent, Ascertained from Whole Statute · and Mischief Sought to be Remedied.**

16.   A statute is to be construed in accordance with the legislative intent, to be ascertained from the whole statute and a consideration of the mischief it was designed to remedy.

**Taxation—Federal Statutes Held not to Contemplate Payment to County of Money Appropriated to State, so as to Entitle Latter to Any Money Paid County in Lieu of Taxes on Railroad Grant Lands Revested in United States (Chamberlain-Ferris Act [Act Cong. June 9, 1916, 39 Stat. 218]; Act Cong. July 13, 1926 [44 Stat. 915]).**

17.   Neither Chamberlain-Ferris Act (Act Cong. June 9, 1916, 39 Stat. 218), requiring payment of 25 per cent of proceeds of sales of railroad grant lands revested in United States, after deducting accrued taxes and stated sum per acre, to state treasurer

---

14.   See 25 R. C. L. 1035.
15.   See 25 R. C. L. 961.
16.   See 25 R. C. L. 1015.

as part of irreducible school fund, and same percentage to county treasurers for schools, roads, etc., nor Act Cong. July 13, 1926 (44 Stat. 915), providing for payment of amounts equal to taxes on such lands to counties until liquidation of all charges against land grant fund in lieu of amount payable under prior act, contemplated payments to county of money appropriated to state, so as to entitle latter to any part of funds paid to county.

**Statutes—Reports of Congressional Committees may be Considered in Construing Statute.**

18. It is permissible, if necessary, to consider the reports of congressional committee on the bill for act being construed.

**Statutes—Title of Act Indicates Congressional Intent, if Doubtful or Ambiguous.**

19. Title of act is indicative of intent of Congress, if there is any doubt or ambiguity pertaining to it.

---

Counties, 15 C. J., p. 589, n. 52.

Courts, 15 C. J., p. 1156, n. 96, 3.

Mandamus, 38 C. J., p. 761, n. 19, p. 869, n. 46, p. 872, n. 61.

Statutes, 36 Cyc., p. 1110, n. 54, p. 1111, n. 59, p. 1128, n. 54, p. 1137, n. 40.

From Marion: L. H. McMahan, Judge.

In Banc.

This is a proceeding in *mandamus* instituted by the State of Oregon upon the relation of I. H. Van Winkle, Attorney General, as plaintiff, against John C. Siegmund, substituted as defendant for J. T. Hunt, James E. Smith and John H. Porter, constituting the County Court, U. G. Boyer, county clerk and D. G. Drager, county treasurer, for the County of Marion, State of Oregon, defendants, to compel the defendant officers of Marion County to pay to the State of Oregon the sum of $24,059.41.

---

18. Opinions or motives of legislators as and to construction, see note in 19 Ann. Cas. 1031. See, also, 25 R. C. L. 1038.

19. Titles of statutes as an element bearing upon their construction, see note in 37 A. L. R. 927. See, also, 25 R. C. L. 1031.

An alternative writ was issued and duly served. The defendants appeared and demurred to the writ upon the following grounds: That the court has no jurisdiction of the subject of this action. That the alternative writ of *mandamus* does not state facts sufficient to constitute a cause of action against defendants, or either of them.

The Circuit Court sustained the demurrers of the defendants to the alternative writ of *mandamus* and the plaintiff declined to plead further. Judgment was rendered dismissing the alternative writ. From this judgment plaintiff appeals.

After the formal allegation of the official character of the relator and the defendants, the alternative writ avers substantially the following:

That by an act of Congress of the United States, approved June 9, 1916, 39 Stat. 218, Chapter 137, a copy of which, marked exhibit "A," is hereto attached and by reference made a part of this writ, it is provided, among other things, that certain lands therein described, title to which had been granted to aid in the construction of a railroad and telegraph line from the Central Pacific Railroad in California to Portland, in Oregon, and from Portland to Astoria and McMinnville in Oregon, and title to part of which had revested in the United States by reason of breach of covenants contained in the said grant, and the timber thereon shall be sold, and the proceeds thereof deposited in the treasury of the United States in a special fund to be designated "The Oregon and California Land Grant Fund," which fund, after deduction of certain moneys therein provided to be paid to said railroad company and its predecessors in interest, and to said railroad, its successors and assigns, and those having

liens on the land, as their respective interests may appear, shall be disposed of in the following manner: (See Section 10 of the act.)

"A separate account shall be kept in the general land office of the sales of land and timber within each county in which any of said lands are situated, and, after deducting from the amount of the proceeds arising from such sales in each county a sum equal to that applied to pay the accrued taxes in that county and a sum equal to $2.50 per acre for each acre of such land therein title to which is revested in the United States under this act, twenty-five per centum of the remainder shall be paid to the state treasurer of the state in which the land is located, to be and become a part of the irreducible school fund of the state; twenty-five per centum shall be paid to the treasurer of the county for common schools, roads, highways, bridges, and port districts, to be apportioned by the county courts for the several purposes above named; forty per centum shall be paid into, reserved, and appropriated as a part of the fund created by the act of Congress approved June 17th, 1902, known as the Reclamation Act; ten per centum shall become a part of the general fund in the treasury of the United States; and of the balance remaining in said Oregon and California Land Grant Fund from whatever source derived twenty-five per centum shall be paid to the state treasurer of the state in which the land is located, to be and become a part of the Irreducible School Fund of the state; twenty-five per centum shall be paid to the treasurer of the county for common schools, roads, highways, bridges, and port districts, to be apportioned by the county courts for the several purposes above-named; and the remainder shall become a part of the general fund in the treasury of the United States. The payments herein authorized shall be made to the treasurers of the states and counties, respectively, by the treasurer of the United States, upon the order of the secretary of the interior, as soon as may be after the close of each fiscal year during

which the moneys were received; *Provided,* that none of the payments to the states and counties and to the reclamation fund in this section provided for shall be made until the amount due the Oregon and California Railroad Company, its successors or assigns, has been fully paid, and the treasury reimbursed for all taxes paid pursuant to the provisions of section nine of this act.''

That by an act of Congress of the United States, approved July 13, 1926, a copy of which is attached to the writ as exhibit ''B,'' it is provided as follows:

''Public—No. 523–69 Congress.
''(H. R. 11329.)

''An act for the relief of certain counties in the states of Oregon and Washington within whose boundaries the revested Oregon and California Railroad company grant lands are located.

''Be it enacted by the Senate and House of Representatives of the United States of America in Congress Assembled:

''That the treasurer of the United States, upon the order of the secretary of the interior, shall pay to the several counties in the states of Oregon and Washington, out of any money in the treasury not otherwise appropriated, amounts of money equal to the taxes that would have accrued against said lands for the years 1916 to 1926, inclusive, if the lands had remained privately owned and taxable.

''Such amounts shall be ascertained by using the assessed value for the year 1915, used by the secretary of the interior in arriving at the accrued taxes for 1915 and the rate of taxes prevailing for the several purposes in each county, school district, port district, or civil subdivision thereof for each of such years.

''Section 2. The secretary of the interior shall ascertain as soon as may be after the approval of this act the rate of taxation so prevailing, compute the amount to be paid each county for each of such years

and issue an order therefor upon the treasurer of the United States, and file same with his report thereon with the secretary of the treasury.

"In computing the amounts so to be paid the secretary of the interior shall include all Oregon and California land grant lands title to which remains in the United States on the 1st day of March of each year.

"Section 3. On or before the 1st day of October of each year after 1926 the secretary of the treasury, upon the order of the secretary of the interior, shall pay to the several counties amounts of money equal to the taxes upon said lands within such counties, to be ascertained, computed, and reported in the same manner as for the preceding years, until all charges against said 'Oregon and California land grant fund' shall have been liquidated and the said fund shows a credit balance as available for distribution under section 10 of the Act approved June 9, 1916.

"Section 4. All moneys paid under the terms of this act shall be charged against the said 'Oregon and California land grant fund,' and all proceeds received from the sale of lands, timber, or otherwise, shall be placed to the credit of such fund until all sums charged against such fund are fully and completely liquidated, and until the United States has been so fully reimbursed no distribution shall be made as provided in section 10 of the said act approved June 9, 1916.

"Section 5. All moneys paid and received under the provisions of this act by any county shall be prorated, apportioned, and paid to the state, county, port districts, school districts, road districts, and other civil subdivisions of the county in the same proportion as the taxes assessed, levied, and collected by the county for the year covered by such payment are apportioned and paid, to the state, county, and each civil subdivision will receive the same amount as though the money had been paid by a taxpayer for each year."

The writ then alleges:

"V—That the amount of money due to be paid to Marion county, Oregon, pursuant to said act of July 13, 1926, by reason of said taxes for the years 1916 to 1926, both inclusive, has been duly computed by the secretary of the interior to be the sum of $119,355.56, and that the treasurer of the United States has duly paid and the county of Marion, state of Oregon, has duly received the said sum of $119,355.56, in satisfaction of such claim.

"VI—That a true statement showing the total valuation of all taxable property in Marion county, Oregon, for each of the years 1916 to 1926, both inclusive, for the state tax in said Marion county for each of said years, the assessed value of all Oregon and California grant lands in said county, revested in the United States, as aforesaid, for each of said years, based on the 1915 tax roll of said county, the rate in mills upon which the said sum of money paid to Marion County, Oregon, pursuant to said act of Congress of July 13, 1926, was computed, and the total amount of state taxes that would have been assessed against said lands for each of said years if same had not been forfeited and withdrawn from taxation, is hereto attached, marked 'Exhibit C' and by reference made a part of this writ.

"VII—That by reason of the matters and things hereinbefore alleged the county of Marion, state of Oregon, has received from the United States and now has in its possession the sum of $24,059.41, which it is specifically required and directed by law to pay to the state of Oregon.

"VIII—That although demand for the payment to the state of Oregon of the said sum of $24,059.41, has been duly made on you and each of you, you have failed, neglected and refused, and still neglect and refuse to pay the same or any part thereof.

"IX—That the petitioner has no plain, speedy or adequate remedy in the ordinary course of law."

Exhibit "C," mentioned in paragraph VI of the writ, is as follows:

"STATEMENT SHOWING COMPUTATION OF STATE TAX ON OREGON AND CALIFORNIA GRANT LANDS IN MARION COUNTY.

"(Rolls of 1916 to 1925, Inclusive.)

| | County Valuation | State Tax | Rate of State Tax in Mills | Assess. Val. of Or. & Cal. grant lands (based on 1915 rolls) | State Tax on Grant lands |
|---|---|---|---|---|---|
| 1916 Roll.... | $41,393,619.00 | $120,767.10 | 3 | $407,920.00 | $1,223.76 |
| 1917 Roll.... | 42,045,031.00 | 125,044.60 | 3.1 | 407,920.00 | 1,264.55 |
| 1918 Roll.... | 42,876,477.00 | 128,128.60 | 3.1 | 407,920.00 | 1,264.55 |
| 1919 Roll.... | 42,292,143.00 | 184,088.20 | 4.5 | 407,920.00 | 1,835.64 |
| 1920 Roll.... | 41,782,605.00 | 393,622.11 | 9.8 | 393,400.00 | 3,855.32 |
| 1921 Roll.... | 42,091,057.00 | 401,473.95 | 9.6 | 391,320.00 | 3,756.67 |
| 1922 Roll.... | 42,290,019.00 | 378,265.50 | 9 | 381,742.95 | 3,435.68 |
| 1923 Roll.... | 43,120,134.00 | 324,793.42 | 7.6 | 355,599.23 | 2,702.55 |
| 1924 Roll.... | 43,724,719.00 | 332,154.11 | 7.6 | 324,472.08 | 2,465.98 |
| 1925 Roll.... | 44,781,877.00 | 313,891.41 | 7.1 | 317,565.18 | 2,254.71 |

Total.............................$24,059.41"

AFFIRMED.

For appellant there was a brief and oral argument by *Mr. Willis S. Moore,* Assistant Attorney General.

For respondents there was a brief and oral arguments by *Mr. John H. Carson,* District Attorney for Marion County, and *Mr. Guy Cordon,* District Attorney for Douglas County.

BEAN, J.—The defendants suggest that a state court does not have jurisdiction under a federal statute where that jurisdiction is not compatible with the jurisdiction of the federal courts under the same statute or where the jurisdiction of the state is excluded by implication, and also that *mandamus* is not maintainable for the reason that plaintiff has an ade-

quate remedy at law. Citing *Claflin* v. *Houseman*, 93 U. S. 130 (23 L. Ed. 833).

1-3. The jurisdiction of the state court, in the present case, is in no way incompatible with the jurisdiction of the federal courts, if under the statute there were any questions of which the federal courts under the law would take cognizance. We fail to see any reason why the federal government or courts would be interested in the matter of the claim of a state made against a county. It is an appropriate matter for the adjudication of the state courts: *Teal* v. *Felton*, 12 How. (53 U. S.) 284 (13 L. Ed. 990); *City of Stanfield* v. *Umatilla River Water Users Assn. et al.*, 192 Fed. 596; 27 R. C. L. 36, § 41. If, as contended by plaintiff, the County of Marion by its officers had in its possession $24,059.41, or any definite sum, belonging to the State of Oregon, we think the writ of *mandamus* should lie. Courts should not hesitate and quibble about fine spun technicalities in the matter of procedure, when the state government and its legal subdivisions are concerned. The parties have evinced a desire that the court will dispose of the main question involved in the case.

The acts of Congress approved April 10, 1869 (14 Stat. 239), and May 4, 1870 (16 Stat. 94), granted to the Oregon and California Railroad Company all the odd-numbered sections of public domain for twenty miles on each side of that company's located railroad, to aid in the construction of the railroad from the Oregon-California boundary line northerly to Portland, Oregon, containing provisos requiring the sale of the grant lands to actual settlers only, in quantities of not more than one quarter-section to a purchaser, and at a price not to exceed $2.50 an acre.

Failure of the railroad company to comply with the terms of the provisos resulted in a suit instituted by the United States for forfeiture of the unsold portion of the grant lands.

The Supreme Court of the United States denied the prayer for forfeiture, held the provisos to be continuing enforceable covenants and left the enforcement thereof to Congress: *Oregon-California R. R. Co.* v. *United States,* 238 U. S. 393 (59 L. Ed. 1360, 35 Sup. Ct. Rep. 908). Pursuant to the decision of the Supreme Court, Congress passed the Chamberlain-Ferris Act (39 Stat. 218), a portion of which is as above set forth in the writ.

The first portion of Section 10 of the Chamberlain-Ferris Act provides, in substance, for the payment to the railroad company, its successors or assigns, and those having liens on the land at the rate of $2.50 per acre for the number of acres of the lands sold or unsold patented to the Oregon-California railroad company, after deducting the amount already received by the railroad company, or its predecessors in interest, on account of said lands, and then provides:

"After the said railroad company, its successors or assigns, and the lien holders shall have been paid the amount to which they are entitled, as provided herein, an amount equal to that paid for accumulated taxes, as provided in section nine thereof, shall be deposited in the treasury to the credit of the United States, thereafter all other moneys received from the sales of land and timber shall be distributed as follows: * * "

(Here follows the portion of Section 10 quoted in the writ.)

4. The claim of the state, in order to be sustained, must be brought within and governed by the terms of

125 Or.—14

Section 5 of the act of July 13, 1926, which, as it is agreed, after making the correction of a typographical error, by changing the word "to" to read "so" in the fourth line from the last in said paragraph, was intended to read as follows:

"All moneys paid and received under the provisions of this act by any county shall be prorated, apportioned, and paid to the state, county, port districts, school districts, road districts, and other civil subdivisions of the county in the same proportion as the taxes assessed, levied, and collected by the county for the year covered by such payment are apportioned, and paid, so the state, county, and each civil subdivision will receive the same amount as though the money had been paid by a taxpayer for each year."

The main question is, Do the allegations of the writ bring the demand of the state within the act of Congress? In order for the writ to disclose the right contended for by the state, it must show that some part of the sum paid to the county should be apportioned and paid to the state, so that the state "will receive the same amount as though the money had been paid by a taxpayer for each year."

5, 6. The writ is wholly wanting in any such showing or allegation. The statement in the writ, that a certain amount would have been levied as a state tax, is not equivalent to a statement that such amount would have been prorated, apportioned or paid to the state so that the state would receive the same amount as though the money had been paid by taxpayer. Neither can such an allegation, as required be made under the law of this state. The statute provides the method by which the state's expenditures are exacted. The State Tax Commission is created by Section 4184,

Or. L., with comprehensive duties relating to the determination and raising of state revenue.

Under the provision of Section 4214, Or. L., it is the duty of the State Tax Commission to ascertain the state revenue and apportion same among the counties. After ascertaining the total amount of revenue necessary for the state purposes for the next ensuing fiscal year, the total amount thereof is to be apportioned among the several counties in the manner provided for by the statute. See Sections 4215, 4216, Or. L. This, as is well known, is apportioned to a county in a lump sum which, under the law, it is presumed was apportioned to Marion County for the years mentioned and has been paid by that county. Therefore, the State of Oregon has not lost one cent in taxes by reason of the revestment of the grant lands.

Let us take, as an illustration, a section of the granted lands in Marion County, and suppose that during the year 1916 it had been taxable to an ordinary taxpayer, but for some reason was not placed upon the tax-rolls at the regular time. The state tax was apportioned in a lump sum to Marion County; and suppose thereafter the section of land had been placed upon the tax-rolls of the county and the taxes thereon assessed and paid to the county, such payment in no way would have affected the state tax. The state would not have been entitled to any portion of the tax paid by such taxpayer. Section 4217, Or. L., provides as follows:

"Alteration in county rolls not necessary. It shall not be necessary to change the values of the particular descriptions of property assessed in each of the several counties on the assessment rolls thereof, but the

county shall collect and pay over as required by law the amount so apportioned, and in no case shall any deduction or abatement be made from the apportionment of any county on account of the delinquency of any taxpayer, or error or omission in the assessment roll."

This section plainly provides that no deduction or abatement shall be made from the apportionment of any county on account of the delinquency of any taxpayer, or error or omission in the assessment-roll.

Section 4339, Or. L., as amended by Chapter 48, page 66, Laws of 1925, requires the county treasurer of the state, on or before the first day of May in each year, to pay over to the state treasurer one half of the amount of the state taxes charged to their respective counties, and on or before the first day of November of each year to pay over the remainder of the money so charged "without any deduction for any cause whatever, which tax shall be paid out of the first moneys collected and paid into the county treasury over which the county has control." If such payment is not made within thirty days after the dates mentioned, the balance is deemed delinquent and declared to be a debt due and owing by the county to the state, subject to a legal rate of interest.

7. In order for a peremptory writ to be issued the alternative writ must disclose a clear duty on the part of defendants to pay the amount therein provided, under the terms of the act of Congress approved July 13, 1926.

8. The obligation of the county to contribute its portion of the state revenue exists only by virtue of the statute and the valid requirement of the county to contribute to the funds or revenues of the state must have its foundation in law. Usually a legislative en-

actment prescribes the duties and obligations of a county to its parent state.

In order for a county officer to be warranted or authorized to pay out the funds of a county to a state official, or anyone else, the law must so require and direct. The county officer making such a disbursement must be able to put his finger upon the law creating the demand and prescribing his official duty to liquidate the same.

9. The allegation of the writ contained in paragraph VII, to the effect that by reason of matters and things alleged in the writ the county of Marion has received from the United States and now has in its possession the sum of $24,059.41, which it is specifically required and directed by law to pay to the State of Oregon, is a mere conclusion based upon other allegations of the writ, and does not fulfill the requirement. The state has not shown a legal duty on the part of defendants to pay it, said sum, or any part thereof.

10. In the case of *Northup* v. *Hoyt*, 31 Or. 524 (49 Pac. 754), this court held that the liability of the county to the state in connection with the payment of such county's apportioned share of state revenue is not limited to payment of the amount of tax money collected on the revenue by the county for state purposes. This court there said, as shown at page 530 of the Reports (49 Pac. 755):

"And all taxes levied for state and county purposes, when collected belong to the county, and the state becomes a preferred creditor to the amount of the state revenue apportioned to it. So that while, for convenience, the rate of taxation included in the general county levy for the special purpose of raising money with which to pay the county's obligation to the state

is designated as a state tax in the law and upon the county records, it is, in fact, a county tax levied for county purposes. The state does not deal with the individual taxpayer, but its revenue is apportioned to, and collected from, the various counties in their corporate capacity, in proportion to the taxable property in each, and is payable by the county, whether collected from the taxpayer or not. * * "

There is then no apportionment by a county in favor of the state of taxes assessed, levied and collected by a county.

11. The whole purview of the act appears to be an effort on the part of the government to relieve the lands involved practically from tax delinquency caused by the Chamberlain-Ferris Act. It is in substance a provision for the payment of all taxes that in ordinary course would have become a lien upon the lands without the usual addition of interest and penalty. If the purpose of the act were assumed to be such, it must be remembered that an ordinary tax delinquency for a year or two years, which is afterward paid, that no part of such payment would be apportioned to the State of Oregon. Therefore, the rates of the state taxes for the several years included in the statement, exhibit "C," attached to the writ, does not govern or affect the amount of the state tax to be paid by a county and does not affect the claim of the state in this proceeding.

12. While there is no direct relation between the state and the individual taxpayer, and no definitely ascertainable division between the state and county of any specific taxes collected by the county, there is such relation and such division between the county and the "port districts, school districts, road districts

and other civil subdivisions of the county" mentioned in Section 5 of the act.

Section 4310, Or. L., provides that "all taxes hereinafter levied by any incorporated city or town, school district, road district, port or other municipal taxing agency or district, shall be levied on the property therein respectively assessable * * ."

Section 4311, Or. L., provides as follows:

"Other taxes to be collected with County taxes. All taxes levied by any school district, road district, incorporated city or town, port, or other municipal corporation or taxing agency or district, now or hereafter authorized by law to levy taxes, shall be collected by the same officer and in the same manner and at the same time as taxes for county purposes are collected."

Section 4314, Or. L., provides in part thus:

"The county treasurer shall keep the moneys received by him from the tax collector in separate funds, and shall pay the same over to the several school districts, towns, cities, ports or other municipal taxing districts or agencies entitled thereto. * * "

There is then a clear distinction between the statutory provisions relating to the funds of the county and the various taxing agencies thereof on the one hand, and the provisions requiring the payment of the state "tax" by the county at definite times and without any deduction, out of the first moneys collected and paid into the county treasury over which the county has control. The former are essentially taxes, available and prorated and apportioned only as collected; the latter a preferred claim and debt, to be paid, whether collected or not.

13. Under the plain provisions of the act of July 13, 1926, the funds received by Marion County thereunder are to be prorated and apportioned to the county, port districts, school districts, road districts and other civil subdivisions of the county, as required by the state law, and no part thereof is due the State of Oregon.

We find no argument on the part of the state pertaining to the last clause of Section 5 of the act of 1926, reading, "so the state, county and each civil subdivision will receive the same amount as though the money had been paid by a taxpayer for each year."

The words "state, county, port districts, etc.," as used in the act are clearly words of general definition, embracing all possible beneficiaries of the funds, and their general terms are restricted by the last clause of Section 5, which provides the method of identifying the actual and particular beneficiaries intended by the act. This construction is further strengthened by the fact that the title of the act and the first four sections thereof refer only to the counties.

No one would contend that a port district, or school district, situated in a county, or counties, named in the act of 1926 would be entitled to have a portion of the money paid to a county, apportioned and paid to such district by a county, unless there would have been some tax upon such grant lands that would have been assessed, levied and collected by such district during the period, so that it would receive the same amount as though the money would have been paid by the taxpayer.

It is said in 1 Blackstone, 87, that:

"There are three points to be considered in the construction of all remedial statutes; the old law, the

mischief, and the remedy; that is, how the common law stood at the making of the act; what the mischief was, for which the common law did not provide; and what remedy the parliament hath provided to cure this mischief. And it is the business of the judges so to construe the act as to suppress the mischief and advance the remedy."

14, 15. It is the province of the court to take into consideration the condition prevailing at the time when a law is enacted. The words of a statute are to be understood in the sense in which they best harmonize with the subject of the enactment and the object and intent which the lawmakers had in view: *State* v. *Hyde,* 88 Or. 1 (169 Pac. 757, 171 Pac. 582, Ann. Cas. 1918E, 688); *Keith* v. *Quinney,* 1 Or. 364, 366; *State* v. *Young,* 74 Or. 399, 403 (143 Pac. 647); Lewis' Sutherland on Stat. Const. (2 ed.), 347.

16. It is an elementary principle that a statute is to be construed in accordance with the legislative intent to be ascertained from the whole statute, and a consideration of the mischief which it was designed to remedy: *Duncan* v. *Dryer,* 71 Or. 548, 557 (143 Pac. 644); *Northern Counties Trust Co.* v. *Sears,* 30 Or. 388, 395 (41 Pac. 931, 35 L. R. A. 188, note).

17. Noticing the general features and purposes of the two acts of Congress it appears that by the terms of the Chamberlain-Ferris Act a separate account is required to be kept of the sales of land and timber within each county containing any of such grant lands. That after deducting from the proceeds an amount equal to the amount of the accrued taxes in that county, and a sum equal to $2.50 per acre of such land therein, title to which is revested in the United States, under the act, 25 per centum of the remainder is to be paid to the state treasurer of the state in

which the land is located, to be a part of the irreducible school fund of the state, 25 per centum shall be paid to the treasurer of the county for common schools, roads, highways, bridges and port districts to be apportioned by the county courts for the several purposes above named; 40 per centum shall be paid as a part of the reclamation fund; and 10 per centum shall become a part of the general fund of the United States treasury. It was not contemplated by the terms of either of the acts that the money appropriated to a state should be paid to a county.

It is seen that an account in the matter is to be kept with each county. Payments authorized by the act are to "be made to treasurers of the states and counties respectively." The accounts of payments to the states and respective counties are entirely separate and distinct. By the proviso in Section 10, none of the payments are to be made until the amount due the railroad company, its successors or assigns, has been fully paid, and the United States treasury reimbursed for all taxes paid pursuant to the act.

Referring now to the act for the relief of the counties, we find (Section 3) provision made for the payment to the several counties of amounts of money equal to the taxes on said lands within such counties, computed in the same manner, "until all charges against said Oregon and California land grant fund shall have been liquidated and said fund shows a credit balance as available for distribution under Section 10 of the act approved June 9th, 1916."

And again Section 4 of the act provides that all moneys paid to the counties shall be charged against the land grant fund, and all proceeds received from the sale of lands and timber shall be placed to the credit of such fund until all sums charged against

said fund are liquidated, and no distribution under Section 10, of the act of June 9, 1916, can be made until the United States has been fully reimbursed.

The payment authorized by the act of July 13, 1916, to be made to the affected counties is not a gratuity but an advancement of money in lieu of the 25 per centum to be paid to the treasurer of the county for common schools, roads, etc., as provided in the Chamberlain-Ferris Act. And such amounts so paid are charged to the respective counties. The provisions of the act are to "render unto Caesar the things which are Caesar's." The 25 per centum to be paid to the state for the benefit of the irreducible school fund under the terms of the Chamberlain-Ferris Act is not mentioned in or affected by the later act.

In Multnomah County, one of the land grant counties, as shown by the statement of the State Tax Commission, during the ten years, 1917 to 1926, the reversion of the grant lands caused an increase in the apportionment of state taxes to that county, during that period, aggregating $449,253. According to the same statement of the Tax Commission, the "amount of government refund of state tax claimed by state," against Multnomah County for the same year is $12,189.

This claim is made after Multnomah County has paid the proportion of state taxes required by statute to be paid by it. Similar claims are made by the state against all of the eighteen grant land counties.

Employ as much argument as we may, there is no law, either state or national, authorizing or requiring any portion of the money demanded by the state to be paid by the county to the State of Oregon.

18. As we noticed, the loss of taxable property by the county by reason of the revestment of the grant

lands was not reflected in the state revenue. The counties were still required to pay their share of the state expenses. This they did by increasing the rate of levy on the remaining taxable property. The state, as a governmental entity, lost nothing by such revestment. It is permissible, if necessary, to consider the report of Congress on the bill for the act in question: *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443 (65 L. Ed. 349, 16 A. L. R. 196, 41 Sup. Ct. Rep. 172); *Byers* v. *We-Wa-Ne,* 86 Or. 617 (169 Pac. 121).

The act was intended to relieve the distress existing in the land grant counties resulting from the withdrawal of taxes of grant lands carrying an assessed valuation of $22,500,000 and returning an annual tax revenue of approximately $500,000. The failure of the Chamberlain-Ferris Act to function according to the intent and expectation of Congress, after ten years had passed and no payments to the counties under Section 10 of the latter act having been made, and there being little hope of there being relief under that act for years to come, and the financial necessities of the several grant land counties for years to come, caused the appeal to the national government for relief, which resulted in the passage of the act of July 13, 1916.

The report of the Committee on Public Lands and Survey of the United States on the Senate bill, of which the house bill was a duplicate, shows among other things that:

"The measure of the injury suffered by the counties is the amount they would have received in taxes had the invested lands remained on the tax rolls. S. 3255 provides redress for that injury by payment commensurate with that loss. It simply makes the

counties whole.  It does at this time what the revest-
ment act was intended to do.  It corrects a mis-
take. * *

"In conclusion, the committee believes that S. 3255
provides for the doing of simple justice.  The gov-
ernment should do the equity it exacts of its people.
Having by its own act done an unintentional, but
none the less real, and very grievous injury to those
remote counties of Western Oregon, it should at their
petition, redress that injury and make the injured
whole.

"S. 3255 offers a reasonable logical remedy for the
existing wrong, without departure from governmental
policy.  The committee recommends its early enact-
ment."

The report of the Committee on Public Lands of
the House of Representatives, being Report No. 1330,
of the 69th Congress, 1st Session, reads, in part, as
follows:

"The bill does not propose that the government
shall pay the counties any moneys in lieu of taxes
on lands publicly held.  It does propose, in view of
the unforeseen and distressing conditions that have
arisen and now exist by reason of the delays in the
disposition of the lands and timber contemplated in
the revestment act but not realized, that the govern-
ment advance now the amount of taxes that would
have accrued on the lands for the years 1916–1926,
inclusive, had they not been revested, and for subse-
quent years until the counties have received the 25
per cent coming to them under the revestment act, or
until the sales have been made to such an extent that
the yearly distribution to the counties practically
equals the former taxes collected therefrom.  The bill
will not give to counties any more money than the
revesting act provides, but it does make the money
available before the sales occur.

"The bill provides that when sales are made and
amounts are available for distribution, the 25 per cent
due the counties shall be withheld from the counties

and paid into the treasury until all amounts advanced to them from the treasury have been repaid thereto.''

19. The title of the act is indicative of the intent of Congress, if there is any doubt or ambiguity pertaining to the act: *Lapina* v. *Williams,* 232 U. S. 78 (58 L. Ed. 515, 34 Sup. Ct. Rep. 196).

There is no provision in the Chamberlain-Ferris Act for moneys to be paid to the state for general state purposes, but only for the benefit of the irreducible school fund. While in the case of the counties the funds were apportioned for the various purposes named, or, in other words, for the general development of the counties, had Congress intended the state to share in the funds appropriated by the act of July 13, 1926, it is not unreasonable to assume that provision would have been made therein for such share to be paid into the irreducible school fund.

It is worthy of note that a statement of the State Tax Commission compiled in 1927, ''showing effect of Oregon and California grant lands upon the apportionment of state taxes to the several counties for the year 1917 rolls 1916,'' and a like statement for each succeeding year, until and including 1926 (rolls of each respective preceding year). ''Valuation based upon the 1915 assessment of said grant land,'' the ''effect of reversion on county apportionment of state taxes,'' as pertaining to Marion County, was to increase the apportionment to Marion County of the state taxes in each year. Such increase of Marion County in 1917 was $1,811 and such increase varies for the several years named, being an increase of $4,904 for the year 1922. This increase of Marion County's state taxes during those years was caused directly by the reversion of said grant lands, and the

withdrawal of the same from taxation.   In some of the grant lands counties the reversion of such grant lands effected a decrease of the apportionment of state taxes for said years.   Such increase in some of the counties equals the decrease in the others, showing that the state lost no revenue by reason of the withdrawal of the grant lands from taxation.

It should also be noted that during nearly every year of the period in question the state apportioned state taxes to the several counties to the full amount up to the 6 per cent constitutional limitation.

It does not appear from the writ that Marion County has received from the United States or has in its possession the sum of $24,059.41, or any sum, which the law requires or directs to be paid to the State of Oregon or which belongs to the state. Therefore, the peremptory writ of *mandamus* is denied and the judgment of the Circuit Court sustaining the demurrer to the writ and dismissing the action is affirmed.                                             AFFIRMED.

COSHOW, McBRIDE and BROWN, JJ., concur.

RAND, C. J., Dissenting.—The State of Oregon on relation of the Attorney-General sued out of the Circuit Court for Marion County a writ of *mandamus* to require the defendants as the proper officers of Marion County to prorate, apportion and pay to the state a part of the moneys paid to and received by Marion County under the act of Congress of July 13, 1926, entitled "An Act for the relief of certain counties in the states of Oregon and Washington within whose boundaries the revested Oregon and California Railroad Company Grant lands are located." The state appeals from an order dismissing the writ.

It appears from the allegations of the writ that pursuant to said act, the treasurer of the United States has paid to and that there has been received by Marion County the sum of $119,355.56, of which it is contended the State of Oregon is entitled to receive from the county as its proportionate part thereof the sum of $24,059.41. The validity of this claim is the only question which we are called upon to determine.

The act provides as follows:

"That the treasurer of the United States, upon the order of the secretary of the interior, shall pay to the several counties in the states of Oregon and Washington, out of any money in the treasury not otherwise appropriated, amounts of money equal to the taxes that would have accrued against said lands for the years 1916 to 1926, inclusive, if the lands had remained privately owned and taxable.

"Such amounts shall be ascertained by using the assessed value for the year 1915, used by the secretary of the interior in arriving at the accrued taxes for 1915 and the rate of taxes prevailing for the several purposes in each county, school district, port district, or civil subdivision thereof for each of such years.

"Sec. 2. The secretary of the interior shall ascertain as soon as may be after the approval of this act the rate of taxation so prevailing, compute the amount to be paid each county for each of such years and issue an order therefor upon the treasurer of the United States, and file same with his report thereon with the secretary of the treasury.

"In computing the amounts so to be paid the secretary of the interior shall include all Oregon and California land-grant lands title to which remains in the United States on the 1st day of March of each year.

"Sec. 3. On or before the 1st day of October of each year after 1926 the secretary of the treasury,

upon the order of the secretary of the interior, shall pay to the several counties amounts of money equal to the taxes upon said lands within such counties, to be ascertained, computed, and reported in the same manner as for the preceding years, until all charges against said 'Oregon and California land-grant fund' shall have been liquidated and the said fund shows a credit balance as available for distribution under section 10 of the act approved June 9, 1916.

"Sec. 4.   All moneys paid under the terms of this act shall be charged against the said 'Oregon and California land-grant fund,' and all proceeds received from the sale of lands, timber, or otherwise, shall be placed to the credit of such fund until all sums charged against such fund are fully and completely liquidated, and until the United States has been so fully reimbursed no distribution shall be made as provided in section 10 of the said act approved June 9, 1916.

"Sec. 5.   All moneys paid and received under the provisions of this act by any county shall be prorated, apportioned, and paid to the state, county, port districts, school districts, road districts, and other civil subdivisions of the county in the same proportion as the taxes assessed, levied and collected by the county for the year covered by such payment are apportioned and paid, to the state, county, and each civil subdivision will receive the same amount as though the money had been paid by a taxpayer for each year."

By Section 1 of the act, it is expressly provided that "the treasurer of the United States * * shall pay to the several counties * * amounts of money equal to the taxes that would have accrued against said lands for the years 1916 to 1926, inclusive, if the lands had remained privately owned and taxable." Section 5 directs that when received by the counties "all moneys * * shall be prorated, apportioned, and

125 Or.—15

paid to the state, county, port districts, school districts, road districts, and other civil subdivisions of the county in the same proportion as the taxes assessed, levied and collected by the county for the year covered by such payment are apportioned and paid to the state, county, and each civil subdivision will receive the same amount as though the money had been paid by a taxpayer for each year.''

Under the provisions of Section 1, each of the counties referred to in the act was to receive and has since received a sum of money equal to the amount of the taxes that would have accrued against the lands if they had not been withdrawn from taxation. The taxes that would have ''accrued'' against the lands clearly mean all taxes that would have been levied against the lands for state, county, district and all other purposes if they had been taxable. In determining what the amount of such taxes would have been if the lands had been taxed and the taxes paid, the Secretary of the Interior was directed to use the assessed value of the lands for the year 1915 and to apply to such value the rate of taxation prevailing in each county and district for all purposes during each of such years. These moneys, when received by the counties, were, by Section 5 of the act, to be apportioned and paid to the state, counties and districts in the same proportion that they would have been apportioned and paid if the moneys had been paid as taxes by the owner of such lands during each of said years.

Under our statute, privately owned land, like all other taxable property within the state, is taxable for state purposes. All taxable property within the state pays its proportionate part, based upon its valuation, of the revenues to be raised for state purposes

and that proportion of the taxes, whatever the amount may be, is a state tax which, in addition to all other taxes, is levied against property for state purposes. This necessarily results from Section 4215, subdivision 4, Or. L., which provides that "the total amount of revenue to be raised for state purposes during the next ensuing year * * shall * * be apportioned among and charged to the several counties in that proportion which the total value of all the taxable property in each county bears to the total value of all the taxable property of the state as equalized, etc." See, also, Section 4212, Or. L. Under these provisions, it is obvious that all of the taxable property in the state of every kind and character bears its proportion of the state tax and the proportion which it so bears is such a part of the total amount of the revenue to be raised for state purposes as the value of such property bears to the total value of all of the taxable property of the state. It follows, therefore, that if these lands had been taxable a state tax would have accrued against them and the amount of such tax constitutes a part of the moneys which were appropriated and have been paid under the provisions of the act.

That a state tax would have accrued against these lands if they had been taxable also follows from the provisions of the two sections next referred to. Section 4300, Or. L., provides: "The county court * * shall * * estimate the amount of money to be raised in its county for county purposes, and apportion such amount, together with the amount of state and school tax, and other taxes required by law to be raised in its county * * according to the valuation of the taxable property in the county for the year * * ." Section 4304, Or. L., provides: "All counties, cities,

school districts, and other corporations * * shall make their total levy in dollars and cents, and not otherwise, and shall so report the levy to the county assessor * * . The county assessor shall compute the rate per cent of levy by dividing the assessed valuation into the total amount of money proposed to be raised by taxation, and said rate per cent when so computed, shall terminate at the nearest mill or tenth of a mill that will produce the amount of money required to be raised.''

Under these provisions the County Courts of the various counties are required first to make an estimate of the amount of money to be raised for county purposes and then to add to that amount the amount of the state, school and all other taxes required by law to be raised in the county and, after apportioning the same according to the valuation of the taxable property in the county, they are required to make a total levy in dollars and cents of all sums to be raised for all of said purposes and to report such levy to the county assessor who computes the rate per cent of levy by dividing the assessed valuation into the total amount of money to be raised by taxation and then applies such rate to all of the property in the county subject to the payment of the taxes to be thus raised. From these provisions, it is clear that the amount of taxes to be raised for state purposes by any one county constitutes a part of the money to be raised by taxation in such county and affects the rate to be applied upon all the taxable property of the county, and that, when this rate is applied to any particular property in the county, a portion of the tax which accrues against such property is a state tax upon such property and is paid exclusively for the purpose of raising a part of the state's revenues.

Hence, under the provisions of our own statute, it is idle to contend that a state tax would not have accrued against the lands in question if they had been taxable and, that being so, the amount of the state tax is a component part of the moneys which have been paid to Marion County and which, under the terms of the act, should have been paid over to the state.

That these lands, if on the tax-roll, would have been subject to the payment of a state tax is clear. That Marion County understood that the amount of this tax was, under the terms of the act, payable to the state is demonstrated beyond question by the tabulations furnished by Marion County to the Secretary of the Interior. Photostatic copies of these claims as made by the counties are certified to by the assistant commissioner of the General Land Office and are before us. During each of the years in question it appears therefrom that the counties summarized the taxes for all purposes which would have been collected from the lands if they had been taxable. For the year 1916—the same form was followed by the county during each of said years—the various taxes for the various purposes are summarized as follows:

|  | Rate. | Value. | Tax. |
| --- | --- | --- | --- |
| State | .003 | $407720 | $1223.16 |
| County | .0049 | 407720 | 1997.83 |
| Co. School and Library. | .1026 | 407720 | 1060.07 |
| Gen. Road | .004 | 407720 | 1630.88 |
| High School Tuition... | .0008 | 407320 | 325.85 |

Total...............$6237.79

The county assigns as reasons for its failure and refusal to pay to the state the state's part thereof

matters which will now be considered. The first contention is that, since the title contains no reference to the state and the state is not named in the first four enacting clauses of the act, this evidenced an intention and purpose on the part of Congress that the state was not to participate in the receipt of any of said moneys, while at the same time it is contended that there is no ambiguity in the act nor uncertainty as to its meaning. The fact that the title contains no reference to the state is of no importance unless there is some doubt or ambiguity in the act. The rule in respect to an act of Congress is that "the title is no part of an act and cannot enlarge or confer powers, or control the words of the act unless they are doubtful or ambiguous." *Cornell* v. *Coyne,* 192 U. S. 418 (48 L. Ed. 504, 24 Sup. Ct. Rep. 383). "It is only in a doubtful case that the title of an act can control the meaning of the enacting clauses." *Lapina* v. *Williams,* 232 U. S. 78 (58 L. Ed. 515, 34 Sup. Ct. Rep. 196).

The fact that the state is not mentioned in the first four enacting clauses of the act affords no ground for argument against the validity of the claim of the state, since it is clear that the first four sections of the act were only intended to make an appropriation of money and to prescribe the method by which the amount of such appropriation should be fixed and determined. Those clauses were not intended to designate the particular corporate entities to which the moneys so appropriated were to be distributed and paid, nor to fix the amount which either or any of them were separately to receive. The amount appropriated was to be "amounts of money equal to the taxes that would have accrued against said lands * *

if the lands had remained privately owned and taxable.'' The amount to be distributed between the state, counties and districts was to depend upon the amount which would have accrued against the lands in favor of each of the designated parties if the lands had been taxable.

The parties to which the money is to be distributed are expressly named and designated in Section 5 of the act and, as so designated, the state is expressly named as one of the parties to which a part of the money shall be paid. In determining the intention of Congress, the fact that the state is so named cannot be overlooked for, unless Congress had intended the state to receive a part of the money, it would not have expressly named the state as one of the corporate entities to which the money should be distributed. In express terms, the act provides that the appropriated moneys shall be ''prorated, apportioned and paid to the state'' as well as to the other parties named in the act. It directs that when paid over to the counties these moneys shall be prorated, apportioned and paid to the state and to the other corporate entities named, so that each of them ''will receive the same amount as though the money had been paid by a taxpayer for each year.'' Having named the state as one of the parties to which the moneys were to be distributed, it is obvious from the language of the act itself that Congress intended for the state to receive such a part of and that particular part of the appropriated moneys ''that would have accrued against said lands (in favor of the state), if the lands had remained privately owned and taxable.'' It is also very clear from a reading of the act that upon receipt of the moneys the counties were charged with the duty of distributing the money in

accordance with the directions contained in the act. Upon their acceptance and receipt of the moneys, the law implied a promise upon their part to distribute it in accordance with the provisions of the act and for the discharge of that duty no direction of any state statute was required. The duty to pay over the money was created by the provisions of the act of Congress under which it was received and arose as a matter of law from the acceptance and receipt of the moneys by the counties. It is, therefore, idle to contend, as it has been asserted here, that before the counties can pay any part of these moneys to the state, we must first be able to point to some statute directing such payment.

Because of the provision contained in Section 5 of the act which directs that the moneys which are to be · prorated, apportioned and paid to the state, county and each civil subdivision so that each "will receive the same amount as though the money had been paid by a taxpayer for each year," it is contended that, if the moneys had been paid by a taxpayer, the state would have received no more money from Marion County and from the other counties named in the act than it actually did receive from them, and that, because of this provision, no effect should be given to that part of Section 1 which provides that the amounts to be paid to the counties shall be "equal to the taxes that would have accrued against said lands * * if the lands had remained privately owned and taxable." This contention is based upon provisions in our statutes which require the counties to pay over to the state at two stated intervals of each year one half of all sums charged against the county as its part of the revenues to be raised for the state for such year. These provisions have been

held to mean that the state is a preferred creditor of the county to the extent of the amount due the state from the county and the claim of the state is payable from the funds of the county whether the taxes upon the property in the county have been paid or not. These provisions merely mean that the state has a priority in payment over other creditors and hence it makes no difference so far as the state's claim against the county is concerned whether the taxes have been paid by any individual taxpayer or not. Congress was not legislating in respect to the method by which the state collects its taxes through the counties. Business of the state must be conducted without regard to delinquency of any particular taxpayer, or the number of such delinquent taxpayers which may own property in any particular county. There is no presumption of law or fact that Congress knew of the method prescribed by our statutes for the collection of the state revenues and there is nothing in the act to indicate that Congress felt any concern as to such method or was legislating with reference thereto. It intended by the act to reimburse the state as well as the counties and districts named in the act for the amounts of money which would have accrued to them separately from the lands themselves if they had not been withdrawn from taxation.

The amounts of the state revenues for each of the years in question were fixed and definite amounts which were apportioned among the several counties of the state in such proportion as the value of the taxable property of each of said counties bore to the total value of all the taxable property of the state, but it is also true that the amounts of the revenues to be raised in each of the land grant counties for county

and district purposes were fixed and definite amounts the same as in the case of the state and these amounts were apportioned so that all of the taxable property in the counties and districts bore its proportionate part of the revenues which were to be raised for such purposes. In each case, the deficit caused by the withdrawal of the lands from taxation was made up by the establishment of a higher rate of taxation imposed upon the remaining taxable property so that each taxpayer affected thereby paid a heavier tax than he would otherwise have been compelled to pay. Measured by the amount of the revenues raised by the state and by the counties and districts in question, each received the same amount of revenue that would have been received if the lands had not been withdrawn from taxation. In a limited and restricted sense, neither the state, counties nor districts lost any part of their revenues and, hence, the argument would apply if it had any force as much against the claims of each and all of them as it does against the claim of the state to share in the appropriated moneys. The appropriation of Congress was not made for the purpose of reimbursing the state, county or districts for any part of their revenues which were lost by reason of the withdrawal but to pay to the state, county and districts the amount of taxes which would have accrued to each from the particular lands in question if they had been taxable.

Now, it appears from a tabulation compiled by the State Tax Commission, contained in a document on file in the office of the Commission, of whose records, it being a branch of the executive department of the state, we take judicial notice, that there were in this state 2,192,000 acres of railroad grant lands with an

assessed valuation of $22,217,357, as appears upon the tax-roll for the year 1915, that were withdrawn from taxation and that of these lands so withdrawn, the assessed valuation of such lands in Marion County was only $407,720. It also appears from said tabulation that the assessed valuation of the remainder of the taxable property in Marion County for said year was over $78,000,000.00. Hence, because of there being such a great disproportion between the valuation of the withdrawn lands in Marion County and the valuation of the remainder of the taxable property of the county, Marion County's proportion of the amount of the state revenues payable by the county was somewhat increased because of such withdrawal of all of such lands throughout the state.

The fact, however, that because of such withdrawal Marion County was compelled, like most of the other counties of the state, to pay a greater proportion of the state revenues than it would have been but for such withdrawal, has nothing to do with any question involved here. The question here is what amount of taxes for all purposes would have accrued against these lands in Marion County if they had been taxable and, of this sum, what amount would have accrued to the state from the lands, what to the county and what, if any, to each of the districts named in the act. The application of this test will show that the amount which would have accrued to the state from these lands in Marion County would have been such a proportion of the total revenues of the state to be raised by taxation as the sum of $407,720 bore to the total valuation of all of the taxable property of the state with the valuation of the withdrawn lands in all of the counties included as a part of the taxable property

of the state and this for the ten-year period in question would have amounted to the sum of $24,059.41, the identical amount claimed in these proceedings.

The contention, however, that if the lands had not been withdrawn from taxation, the proportion of the state revenues payable to the state by Marion County would not have been more than it would have been if the lands had been taxable is not true, for in that case there would have been added to the amount payable by Marion County an additional sum which would have been equal to such a proportion of the entire revenues of the state as the sum of $407,720, the assessed valuation of the lands, bore to the total valuation of all of the taxable property of the state. This additional sum for each year in question is one of the amounts which would have "accrued against the lands" within the meaning of the act.

To give to the act the construction contended for, which is so obviously contrary to the plain meaning of its terms, will cause a loss to the state of the sum of $1,349,395.48, for, according to said tabulation of the Tax Commission, there has been paid under the act to the eighteen land grant counties of the state the sum of $6,734,036.39, of which the state's part, if the state is to receive what would have accrued to it from all of the withdrawn lands, amounts to said sum of $1,349,395.48. Hence, unless Marion County, this being a test case, is compelled to pay over to the state the state's part of the moneys which it has received under the act, the loss to the state will amount to said sum. This is unthinkable in view of the fact that the counties and districts have received from the federal government under the act all sums which would have accrued to them as county and district

taxes if the lands had been taxable and, in addition thereto, they have also received, because of taxes which would have accrued to the state if the lands had been taxable, the large sum of money just referred to.  It is clear from the language of the act that Congress intended that the counties, upon receipt of the moneys, should retain only their part thereof and that they should pay to the state its part of the appropriated moneys.  There is nothing in the act to indicate an intention upon the part of Congress that the counties should retain any more than what would have accrued to them if the lands had been taxable and, having received an amount equal to all of the taxes that would have accrued to them and to the districts therein as well as the amount which would have accrued to the state from the lands, there is no justification for holding that the counties may retain the state's part of the moneys as well as their own. Under the express terms of the act, the amounts appropriated were to be determined by applying to the assessed valuation of the lands the prevailing rate of taxation in the several counties and this rate, as we have shown, was computed by dividing the aggregate amount of all sums to be raised in the county for state, county and district purposes by the total valuation of taxable property in such county or district. It requires only a very simple computation to show that a multiplication of the total assessed valuation of the property by the prevailing rate will produce a sum equal to the amounts levied for both state and county purposes.

The effect of the withdrawal of these lands upon some of the counties in which the lands were situated and upon other counties in which there were no such

lands is pointed out by the Tax Commission in its tabulated statement in these words:

" * * if the forfeited lands had remained on the tax rolls, Douglas County would have paid into the state treasury during the 10 years, 1917 to 1926, $277,537 more than has been actually paid, or an increase of nearly 17 per cent. Jackson and Lane have saved state taxes during that period in the amounts of $207,986 and $170,043, respectively, but the reversion cost Multnomah County $449,253 during the decade and Umatilla, the next heaviest loser as far as state taxes are concerned, was obliged to pay an additional $60,567 as her tribute to the land grant forfeiture."

In its appropriation of these moneys, it must be borne in mind that Congress was dealing with moneys belonging exclusively to the federal government and over which it had the absolute control. The directions contained in the act prescribing the manner in which the moneys were to be prorated, apportioned and paid and to whom they should be paid are conclusive upon the counties and the courts of this state. These directions must be enforced according to the expressed intention of the act. Both from the language of the act and from its objects and purposes, it is clear that Congress intended for the state to receive a part of these moneys and that the counties were to become charged with the duty of merely distributing the moneys according to the directions contained in the act. One of those directions was that the counties should prorate, apportion and pay to the state that part of the money which would have accrued against the lands as a state tax if the lands had not been withdrawn from taxation. Upon the counties' refusal to perform that duty, the state is clearly entitled to compel its performance without

regard to any of the technical objections which have been urged against the enforcement of its claim in these proceedings.

Sections 3 and 4 of the act each contain a reference to Section 10 of an act approved June 9, 1916, commonly known as the Chamberlain-Ferris Act. Section 3 directs the Secretary of the Treasury to make like payments to the several counties after 1926 until all charges against said Oregon & California Land Grant funds shall have been liquidated and said funds show a credit balance available for distribution under said Section 10 of the Chamberlain-Ferris Act. The moneys involved in these proceedings were paid for the year 1926 and the years prior thereto. Hence, that reference can have no possible bearing upon the distribution of these moneys. Section 4 directs that moneys paid under the terms of this act shall be charged against said fund and that all proceeds received from the sale of lands, timber or otherwise shall be credited to such fund until all sums charged against the fund have been liquidated and the United States has been fully reimbursed, after which distribution may be made as provided in Section 10 of the Chamberlain-Ferris Act. That reference has nothing to do with any question involved here. The distribution of these moneys is not in any way controlled by any of the provisions of the Chamberlain-Ferris Act. That must be made in accordance with the terms of the act we have been considering. If the moneys in controversy here had been payable under the provisions of the Chamberlain-Ferris Act and not under the provisions of this act, it may fairly be assumed that the Secretary of the Interior would not have ordered the Secretary of the Treasury to pay and the Secre-

tary of the Treasury would not have paid them under this act but would have kept them for distribution under the Chamberlain-Ferris Act.

Upon receipt of these moneys by the several counties, it became the duty of the counties, as directed by Congress, to prorate, apportion and pay both to the state and to all "port districts, school districts, road districts, and other civil subdivisions of the county" in which any of said lands were situated such a sum of money as would have been "equal to the taxes that would have accrued against said lands" in favor of each thereof for the years in question "if the lands had remained privately owned and taxable."

From this it follows that the judgment and order appealed from should be reversed and that a peremptory writ should issue requiring Marion County to pay to the State of Oregon the sum of $24,059.41, and it should be so ordered.

BELT and ROSSMAN, JJ., concur.